IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**BARBARA DOOLITTLE,**                     Case No. 1:17 CV 1942

       Plaintiff,

       v.                     Magistrate Judge James R. Knepp, II

**COMMISSIONER OF SOCIAL SECURITY,**

       Defendant.                     MEMORANDUM OPINION AND ORDER

## INTRODUCTION

Plaintiff Barbara Doolittle ("Plaintiff") filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny disability insurance benefits ("DIB"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). The parties consented to the undersigned's exercise of jurisdiction in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 12). For the reasons stated below, the undersigned affirms the decision of the Commissioner.

## PROCEDURAL BACKGROUND

Plaintiff filed for DIB in October 5, 2012, alleging a disability onset date of July 1, 2007. (Tr. 12, 458). Her date last insured was December 31, 2012. (Tr. 15). Her claims were denied initially and upon reconsideration. (Tr. 312, 319). Plaintiff then requested a hearing before an administrative law judge ("ALJ"). (Tr. 403). Plaintiff (represented by counsel), and a vocational expert ("VE") testified at a hearing before the ALJ on June 4, 2014. (Tr. 262-80). On August 5, 2014, the ALJ found Plaintiff not disabled in a written decision. (Tr. 333-43). On November 25, 2015, the Appeals Council remanded the case for further consideration of Plaintiff's use of a walker. (Tr. 352-53). Following a second hearing on May 4, 2016 (Tr. 238-61), the ALJ again

found Plaintiff not disabled a written decision dated June 24, 2016 (Tr. 12-27). The Appeals Council denied Plaintiff's second request for review, making the May 2016 hearing decision the final decision of the Commissioner. (Tr. 1-6); *see* 20 C.F.R. §§ 404.955, 404.981. Plaintiff timely filed the instant action on September 14, 2017. (Doc. 1).

## FACTUAL BACKGROUND

<u>Personal Background and Testimony</u>

Plaintiff was born in March 1965, making her 42 years old on her alleged onset date, and 47 years old on her date last insured. (Tr. 25). Plaintiff alleges disability due to narcolepsy, agoraphobia, depression, chronic obstructive pulmonary disease ("COPD"), congestive heart failure, chronic back and hip pain, arthritis, fibromyalgia, hypertension, and asthma. (Tr. 281). Plaintiff had past relevant work as a certified nurse's aide ("STNA"). (Tr. 256).

*2014 Hearing Testimony*

Plaintiff arrived to the hearing with a rolling walker, oxygen tank, and cannula. (Tr. 266-67). She could not stand or walk without the walker "at all". (Tr. 266). Both the walker and oxygen tank were prescribed in 2012. (Tr. 266-67).

Plaintiff needed assistance getting dressed, and getting in and out of the shower. *Id*. Her roommate did all of the cleaning and cooking because she was unable to stand for more than ten minutes at a time. (Tr. 268). Plaintiff spent her spare time lying in bed, to relieve the pressure from her feet and back. *Id*. She used a CPAP machine three to four nights per week. (Tr. 270). Plaintiff took medication for depression and anxiety, which "sometimes" helped with her symptoms. *Id*. She described herself as "real anxious" and suicidal, but was not seeing a mental health provider. *Id*.

Plaintiff testified she worked in a nursing home for 30 years, and received her STNA certification while employed there in 2009. (Tr. 242). Plaintiff testified she left that job in late 2009 because she was unable to lift a patient due to congestive heart failure and frequent shortness of breath. (Tr. 243). She was then self-employed from 2010 through 2013 as a home-healthcare worker. *Id.*

Plaintiff arrived to the hearing in a wheelchair, which was prescribed two months prior and used "all the time." (Tr. 245). Plaintiff entered a nursing home in October 2015 because she "kept going back and forth to the hospital from the homeless shelter and . . . because [her] health kept declining." *Id*. Prior to the wheelchair, Plaintiff used a walker that had a seat on it. (Tr. 246). Plaintiff was given the walker when she arrived at the nursing home in October 2015 due to "unsteady gait", and used it "all the time" for walking and standing. *Id*. She also experienced pain in her lower back and left leg, and was prescribed Morphine tablets by nursing home staff for pain management. (Tr. 250). Plaintiff was hospitalized (at an unspecified time) for a stroke, and continued to have left side weakness and numbness as a result. (Tr. 252-53). She could not hold a pencil or cup of coffee in her left hand due to shaking. (Tr. 253). With her right hand, Plaintiff could button her clothes, write, feed herself, and brush her teeth. (Tr. 254).

<u>Relevant Medical Evidence</u>[1]

In December 2009, Plaintiff self-reported to North Central Mental Health ("NCMH") due to depressed mood, anhedonia, delayed sleep pattern, variable appetite, chronic fatigue, feelings

---

1. The relevant time period for consideration in this case is July 1, 2007 (alleged onset date) to December 31, 2012 (date last insured). Therefore, the undersigned summarizes the medical records relevant to Plaintiff's impairments during that time. *Moon v. Sullivan*, 923 F.2d 1175, 1182 (6th Cir. 1990) ("In order to establish entitlement to disability insurance benefits, an individual must establish that he became "disabled" prior to the expiration of his insured status."). Post-dated

of worthlessness, and decreased ability to concentrate. (Tr. 699). She reported panic attacks and agoraphobia with chest pain and difficulty breathing. *Id*. Plaintiff reported she quit her job as a STNA six months prior due to anxiety symptoms. (Tr. 700). She was unable to function in most social situations because of panic attacks, but enjoyed walking in the park, going to the mall, and taking her daughter to the zoo. *Id*. On examination, Plaintiff was neat, clean, and appropriately dressed. (Tr. 701). She had a depressed mood, and was anxious. *Id*. Plaintiff was cooperative, oriented, and had clear speech. *Id*. A Global Assessment Functioning ("GAF") score[2] of 44 was assigned. (Tr. 702).

Plaintiff went to the emergency room in January 2010, for weakness in her left arm that began two months prior. (Tr. 718). She noted the weakness worsened after a recent argument with her daughter. *Id*. The attending physician reported a normal physical examination, diagnosed anxiety, and referred Plaintiff to her primary care physician. (Tr. 718-19).

Later in January 2010, Plaintiff reported to NCMH for an adjustment to her Klonopin and Xanax prescriptions. (Tr. 843). Shamsun Nahar, M.D., observed Plaintiff had intact judgment and good insight, but impaired cognition with short-term memory deficits. *Id*. Dr. Nahar adjusted Plaintiff's medication. *Id*. Five days later, Plaintiff returned to NCMH. (Tr. 838). She had a clean appearance, normal speech, average eye contact and demeanor, no delusions, and no anxiety. *Id*.

---

evidence is immaterial unless it relates back to the period under review. *Strong v. Comm'r of Soc. Sec.*, 88 F. App'x 841, 845 (6th Cir. 2004) ("Evidence of disability obtained after the expiration of insured status is generally of little probative value.").

2. The GAF scale represented a "clinician's judgment" of an individual's symptom severity or level of functioning. Am. Psych. Ass'n, *Diagnostic & Statistical Manual of Mental Disorders,* 32-33 (4th ed., Text Rev. 2000) ("DSM-IV-TR"). A GAF score of 41-50 indicated "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM-IV-TR at 34.

She rated her depression as a six out of ten. *Id*. She was cooperative and had normal cognition. *Id*. At a February 2010 appointment, these mental status findings were unchanged, except Plaintiff denied depression, and said she was "having a good day". (Tr. 833). Plaintiff was discharged from NCMH in April 2010 after missing or cancelling four appointments. (Tr. 831). Her diagnoses at discharge were major depression, recurrent, severe, without psychotic features; and panic disorder with agoraphobia. (Tr. 829).

In May 2010, Plaintiff went to the emergency room for weakness on her left side, and shortness of breath with coughing. (Tr. 724). On examination, Plaintiff had intact cranial nerves, full motor strength in all groups, intact sensory findings, and 4/5 strength in all extremities. (Tr. 725). Plaintiff was able to ambulate, and walked heel to toe "very slowly". *Id*. She was able to maintain her position, and did not list. *Id*. Plaintiff had a normal MRI. (Tr. 727). The attending physician diagnosed COPD exacerbation, ataxia, and weakness of uncertain etiology. (Tr. 725). He noted Plaintiff was "able to ambulate without difficulty", and had a walker at home. (Tr. 727).

Plaintiff saw primary care physician Marvin Im, D.O., in August 2010. (Tr. 773). Plaintiff complained of back pain and fibromyalgia. *Id*. On examination, Plaintiff was in no acute distress, had a normal mood and affect, had full range of motion in all joints; and normal sensation, reflexes, and muscle strength. (Tr. 774). Dr. Im performed a fibromyalgia exam, and identified eleven out of eighteen tender points. *Id*. Dr. Im diagnosed hip pain, low back pain syndrome, and fibromyalgia. (Tr. 774-75).

In October 2010, Plaintiff saw T. Rodney Swearingen, Ph.D., for a consultative psychological examination. (Tr. 811-15). Plaintiff told Dr. Swearingen she used a walker, but did not bring it with her to the appointment because she could not fit it in her car. (Tr. 812). On examination, Dr. Swearingen noted Plaintiff appeared to have adequate insight into her own mental

health concerns. (Tr. 814). Plaintiff detailed the struggles of her prior year: she was evicted from her apartment, her mother died, her stepson committed suicide, and she separated from her husband. *Id*. Dr. Swearingen noted Plaintiff was "anxious" during the appointment. (Tr. 813). He found no evidence of visual or auditory hallucinations, although she reported being "very suspicious" of other people. *Id*. Dr. Swearingen diagnosed panic disorder with agoraphobia and post-traumatic stress disorder ("PTSD") due to a history of physical and sexual assault. (Tr. 814).

Plaintiff was admitted to Fairview Hospital for one week in April 2012 for treatment of a COPD exacerbation, hyperglycemia, hypokalemia, and new onset diabetes. (Tr. 944). Plaintiff received blood sugar management treatments, breathing treatments, steroids, supplemental oxygen, and antibiotics. (Tr. 945). During her hospitalization, Plaintiff had a physical therapy evaluation by Bojan Ivkovic, P.T. (Tr. 952-54). Plaintiff stated she lived in a second-story apartment with 24 stairs leading to it. (Tr. 952). Further, Plaintiff stated she owned no medical equipment, noting she ambulated independently without an assistive device in the past. (Tr. 952-53). On examination, Mr. Ivkovic noted a normal range of motion, 4/5 strength in her right leg, and 3/5 in the left. *Id*. He observed Plaintiff walk 100 feet with a rolling walker, and noted she "require[d]" the assistive device. *Id*.

Plaintiff was hospitalized for three days in May 2012 after she reported to the emergency room with chest pain. (Tr. 1059). Serafin Garcia, M.D., noted Plaintiff's back, sensory, and extremity functioning was normal; she had no deformities, edema, or skin discoloration; no calf tenderness; a normal gait and reflexes; and grossly intact sensation. (Tr. 1061-62). She reported

no pain in her back. (Tr. 1062). Plaintiff's chest pain and shortness of breathe resolved during hospitalization and she was discharged. (Tr. 1213, 1221).

Plaintiff was again hospitalized for four days in June 2012, for COPD exacerbation. (Tr. 1008). On examination, Dr. Garcia found grossly intact sensation and no neurological deficits. (Tr. 1009). Plaintiff's diagnoses on discharge were COPD, diastolic heart failure, cellulitis, obesity, chronic pain, backache, myalgia and myositis, hypertension, dysthymic disorder, congestive heart failure, narcolepsy, agoraphobia with panic disorder, PTSD, and hyperlipidemia. (Tr. 1010).

Plaintiff saw Dr. Garcia again in October 2012, for an outpatient visit. (Tr. 1292). She complained of cough, congestion, and wheezing during the past week, weakness in both legs, and hip and back pain. *Id*. Dr. Garcia noted Plaintiff had bilateral edema which improved with medication, but "remain[ed] weak and walk[ed] with [a] walker for balance" and to prevent falls. *Id.*

Plaintiff attended a consultative examination with psychologist Richard Davis in November 2012. (Tr. 1364). Dr. Davis noted Plaintiff used a walker, but walked from the waiting room to his office without it. (Tr. 1365). Plaintiff detailed her difficult childhood, marital problems, and struggles with addiction. *Id*. Dr. Davis noted Plaintiff outlined her medical history in great detail. *Id*. She was last employed at a nursing home, but quit due to problems getting along with supervisors. (Tr. 1366). Plaintiff was not under the care of a mental health professional at the time of the examination. *Id*. On examination, Plaintiff had a "shabby" appearance and dull affect. (Tr. 1367). She had no fragmentation of thoughts or ideas. *Id*. She had appropriate eye contact, reported difficulty sleeping, and expressed feelings of worthlessness. *Id*. Plaintiff further reported anxiety, but did not present any symptoms during the examination. *Id*. Plaintiff stated she did not have any friends, but Dr. Davis noted she lived with people that she referred to as "friends". (Tr. 1369). Dr.

Davis diagnosed adjustment disorder with depressed mood, borderline intellectual functioning, and panic disorder with agoraphobia. *Id.*

<u>Opinion Evidence</u>

*Treating Physician*

In October 2012, Dr. Garcia completed mental and physical capacity medical source statements. (Tr. 1359-62). In the mental capacity statement, Dr. Garcia checked "poor"[3] in every single category of functioning. (Tr. 1359-60). The portion of the form requesting medical or clinical support for the findings was left blank. (Tr. 1360). In his physical assessment, Dr. Garcia checked "YES", when asked if Plaintiff had any lifting/carrying restrictions, but did not fill in the section regarding how many pounds Plaintiff could occasionally or frequently lift. (Tr. 1361). He wrote "0" for the amount of hours Plaintiff could stand, walk, or sit. *Id.* Again, the portion of the form requesting medical or clinical support was left blank. *Id.* Dr. Garcia opined Plaintiff could rarely/never climb, balance, stoop, crouch, kneel, or crawl. *Id.* He again left the medical support question for the postural activity restrictions blank. *Id.* Dr. Garcia found Plaintiff could occasionally handle and feel. (Tr. 1362). In support of these findings, Dr. Garcia cited weakness, generalized myalgia, COPD, hypoxemia, hypertension, congestive heart failure, and fibromyalgia. *Id.* He also assessed workplace environment restrictions against heights, moving machinery, temperature extremes, and pulmonary irritants. *Id.* In support, Dr. Garcia cited agoraphobia, hypertension, COPD, congestive heart failure, and Plaintiff's use of a walker and supplemental

---

3. The form defined a "poor" ability as an area where the "ability to function is significantly limited". (Tr. 1359).

oxygen. *Id*. He noted Plaintiff was prescribed a walker, and needed an "at will" sit/stand option. *Id*.

*Examining Physicians*

In October 2010, Dr. Swearingen opined Plaintiff's ability to relate appropriately and predictably in a work environment was moderately impaired due to panic attacks, and agoraphobia. (Tr. 814). He opined Plaintiff's intellectual abilities were not impaired. *Id*. She could perform repetitive tasks, and had good short-term memory and concentration. (Tr. 815). He opined Plaintiff's ability to cope with stress was moderately impaired due to chronic anxiety, panic attacks, social anxiety, PTSD, and depression symptoms. *Id*. She could manage any benefits awarded to her. *Id*.

In November 2012, Dr. Davis opined Plaintiff had the ability to understand, remember and carry out at least simple instructions. (Tr. 1368). She experienced some depression, which could interfere with her ability to deal with situations. *Id*. She could perform simple repetitive tasks. *Id*. He noted Plaintiff "s[aw] herself as unemployable primarily because of physical problems." *Id*. Dr. Davis agreed noting, Plaintiff "presents with a long list of things wrong with her physically that seemingly accounts more for her being unemployable now than the emotional problems." (Tr. 1369).

*Reviewing Physicians*

In October 2010, Dimitri Teague, M.D., reviewed the record and offered an opinion on Plaintiff's physical impairments. (Tr. 288-90). Dr. Teague found Plaintiff could occasionally lift/carry twenty pounds, and frequently carry ten pounds. (Tr. 288). She could sit, stand, or walk for approximately six hours in an eight hour workday. *Id*. Plaintiff was limited in her ability to use foot controls. (Tr. 289). Plaintiff could occasionally climb ramps or stairs, but never climb ropes,

scaffolds, or ladders. *Id*. Dr. Teague found Plaintiff needed to avoid concentrated exposure to extreme heat, cold, humidity, and fumes. (Tr. 289-90).

In January 2013, Anne Prosperi, D.O., reviewed the record and concurred with Dr. Teague's findings except that she found Plaintiff did not have any limitations with exposure to exposure to extreme heat, cold, humidity. (Tr. 306). Dr. Prosperi also differed in finding Plaintiff could only stand or walk for a total of four hours in an eight hour workday. (Tr. 305).

In November 2012, psychological consultant Katherine Fernandez, Psy.D., reviewed the record and offered an opinion on Plaintiff's mental impairments. (Tr. 303-308). Dr. Fernandez assessed mild restriction in activities of daily living; moderate restriction in maintaining social functioning; and moderate difficulties in concentration, persistence, and pace. (Tr. 303).Dr. Fernandez opined Plaintiff was not significantly limited in her ability to understand, remember, and carry out simple instructions; maintain a routine without supervision; work with or in proximity to others; or make work related decisions. (Tr. 307-08). She was moderately limited in her ability to carry out detailed instructions, maintain concentration for an extended period of time, interact appropriately with the public, or respond to changes in the work setting. (Tr. 308). In April 2013, psychological consultant Cynthia Waggoner, Psy.D, reviewed the record and concurred with Dr. Fernandez's findings, except that she found Plaintiff had a mild restriction in activities of social functioning. (Tr. 319-20, 324-25).

VE Testimony

A VE appeared and testified at the hearing before the ALJ. *See* Tr. 255-61. The ALJ asked the VE to consider a person with Plaintiff's age, education, and vocational background who was physically and mentally limited in the way the ALJ determined Plaintiff was. (Tr. 256-57). The

VE opined such an individual could not perform Plaintiff's past work (Tr. 256), but could perform other jobs such as a document specialist, addresser, or a surveillance system monitor (Tr. 258).

ALJ Decision

The ALJ made the following findings of fact and conclusions of law in her June 24, 2016 decision:

1. The claimant last met the insured status requirements of the Social Security Act on December 31, 2012. Therefore, to be found disabled, the claimant would have to demonstrate that she was disabled as that term is defined in the Social Security Act on or before December 31, 2012.

2. The claimant did not engage in substantial gainful activity during the period from her alleged onset date of July 1, 2007 through her date last insured of December 31, 2012 (20 CFR 404.1571 *et seq.*).

3. The claimant has the following severe impairments: chronic obstructive-pulmonary disease; diabetes mellitus; congestive heart failure; dysfunction-major joints; affective disorders; anxiety disorders; borderline intellectual functioning; obstructive sleep apnea; obesity; and fibromyalgia (20 CFR 404.1520(c)).

4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 CFR 416.1520(d), 404.1525, and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a), limited to lifting and/or carrying 20 pounds occasionally, 10 pounds frequently; with the ability to stand and/or walk 4 hours in an 8 hours work day; with the ability to sit about 6 hours in an 8 hour workday; with the ability to occasionally climb ramps and stairs; precluded from climbing ladders, ropes, and scaffolds; with the ability to frequently balance; with the ability to frequently stoop; with the ability to occasionally kneel; with the ability to occasionally crouch; precluded from exposure to fumes, odors, dusts, gasses, poor ventilation; with the ability to occasionally crawl; precluded from all exposure to hazards (defined as industrial machinery, unprotected heights, and commercial driving etc.); retaining the ability to understand and remember instructions for simple, repetitive tasks; with the ability to sustain simple, repetitive tasks in a relaxed setting without strict time pressures or production quotas; limited to superficial interaction with others, including the public; with the ability to adjust to occasional changes; and with a requirement that the claimant be able to occasionally use a walker for ambulation.

6. Through the date last insured, the claimant is unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was born on March 1, 1965 and was 47 years old, which is defined as a younger individual age 45-49, on the date last insured (20 CFR 404.1563).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Through the date[] last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569, 404.1569(a)).

11. The claimant was not under a disability, as defined in the Social Security Act, from July 1, 2007, the alleged onset date, through December 31, 2012, the date last insured. (20 CFR 404.1520(g)).

(Tr. 15-27).

### STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or

indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 404.1520—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.*

Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

**DISCUSSION**

Plaintiff first argues the ALJ erred in assessing the medical necessity of a walker and, therefore, also erred at Step 3 of the sequential analysis because such evidence supports a finding that she met or equaled Listings 1.02 and 11.14. (Doc. 15, at 13, 15). Next, Plaintiff argues the ALJ failed to properly evaluate the severity of her psychiatric impairments, and give appropriate weight to the opinions of her providers. *Id.* at 18. The Commissioner responds that the ALJ properly considered the opinions of the providers, and properly considered Plaintiff's use of a walker. (Doc. 17, at 11, 18). For the reasons discussed below, the undersigned affirms the decision of the Commissioner.

Physical Impairment

*Step 3 Finding*

Plaintiff argues the ALJ erred at Step 3 of the sequential analysis because the evidence of record (including her use of a walker) supports a finding that she meets or equals Listings 1.02 and 11.14. The Commissioner responds that the ALJ did not err, and properly considered Plaintiff's use of a walker when she determined Plaintiff did not meet either Listing. For the reasons discussed below, the undersigned agrees with the decision of the Commissioner and affirms.

A claimant's impairment must meet every element of a Listing before the Commissioner may conclude that she is disabled at Step Three of the sequential evaluation process. *See* 20 C.F.R. § 404.1520; *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 855 (6th Cir. 1986). The claimant has the burden to prove all the elements are satisfied. *King v. Sec'y of Health & Human*

*Servs.,* 742 F.2d 968, 974 (6th Cir.1984). Moreover, "[t]he burden of providing a . . . record . . .

complete and detailed enough to enable the Secretary to make a disability determination rests with

the claimant." *Landsaw v. Sec'y of Health & Human Servs.,* 803 F.2d 211, 214 (6th Cir.1986). It

is not sufficient to come close to meeting the conditions of a Listing. *See, e.g., Dorton v. Heckler,*

789 F.2d 363, 367 (6th Cir.1989) (Commissioner's decision affirmed where medical evidence

"almost establishes a disability" under Listing).

*Listing 1.02*

To establish disability based on a major dysfunction of a joint under Listing 1.02, Plaintiff

must establish:

> Major dysfunction of a joint(s) (due to any cause): Characterized by gross
> anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis,
> instability) and chronic joint pain and stiffness with signs of limitation of motion
> or other abnormal motion of the affected joint(s), and findings on appropriate
> medically acceptable imaging of joint space narrowing, bony destruction, or
> ankylosis of the affected joint(s). With:

> A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or
> ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b;

> or

> B. Involvement of one major peripheral joint in each upper extremity (i.e., shoulder,
> elbow, or wrist-hand), resulting in inability to perform fine and gross movements
> effectively, as defined in 1.00B2c.

20 C.F.R. § Pt. 404, Subpt. P, App. 1, Listing 1.02. The "inability to ambulate effectively"

referenced in 1.02(A), provides:

> (1) Definition. Inability to ambulate effectively means an extreme limitation of the
> ability to walk; i.e., an impairment(s) that interferes very seriously with the
> individual's ability to independently initiate, sustain, or complete activities.
> Ineffective ambulation is defined generally as having insufficient lower extremity
> functioning (see 1.00J) to permit independent ambulation without the use of a hand-
> held assistive device(s) that limits the functioning of both upper extremities.

> (Listing 1.05C is an exception to this general definition because the individual has the use of only one upper extremity due to amputation of a hand.)

> (2) To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 1.00(B)(2)(b)(1)-(2). In addition, the regulations provide that "[t]he inability to ambulate effectively or the inability to perform fine and gross movements effectively must have lasted, or be expected to last, for at least 12 months." § 1.00(B)(2)(a).

In her decision, the ALJ determined Plaintiff did not meet the requirements of Listing 1.02. (Tr. 16). She explained:

> The claimant presented to an emergency room on October 12, 2009 complaining of left hip pain after hitting her left hip on a table. She reported she takes Vicodin for chronic back pain and lupus pain but that she had run out of Vicodin that day. Curiously, lupus does not appear elsewhere. Evaluation found evidence only of left hip contusion although the claimant continued to complain of this pain (Exhibit 4F/8).

> The claimant has been examined on multiple occasions for a variety of pains, joint swelling, joint pain, muscle weakness, and stiffness. She has had some right calf tenderness and edema but this improved with Lasix (Exhibit 12F/2). She has also complained of left hip pain although her gait has remained normal. The claimant has generally remained neurologically intact, alert and oriented, no memory deficit, with no focal motor or sensory deficits and deep vein thrombosis has been ruled out.

*Id.*

As noted above, Listing 1.02 requires that Plaintiff establish a "major dysfunction of a joint", which may be "characterized by gross anatomical deformity . . . *and* chronic joint pain *and*

stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), *and* findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s)." 20 C.F.R. Pt. 404, Subpt. P., App'x 1, Listing 1.02 (emphasis added). Plaintiff argues "the medical documentation shows that acceptable clinical evaluations found [she] had a condition that affected the lower extremities (legs, ankles, feet), resulting in her inability to ambulate effectively, because she required the use of a walk[er] for balance and to prevent falls, and even with the walker – was unable to ambulate more than 100 feet as of April 24, 2012." (Doc. 15, at 17) (citing Tr. 953, 1292). However, Plaintiff does not identify exactly what "condition" affected her lower extremities, and how the condition was diagnosed. Thus, even if the evidence established Plaintiff's use of a walker was medically necessary, she still has not presented sufficient medical evidence to establish a "gross anatomical deformity" of a major joint supported by medically acceptable imaging studies as required under the Listing. 20 C.F.R. Pt. 404, Subpt. P., App'x 1, Listing 1.02. And, as noted above, it is Plaintiff's burden to prove all the elements of a Listing are satisfied. *King,* 742 F.2d at 974.

Here, the ALJ pointed to several records in her analysis for Listing 1.02, and her decision is supported by substantial evidence. First, she pointed to an October 2009 emergency room visit where Plaintiff's chief complaint was left hip pain. (Tr. 16) (citing Tr. 712). Plaintiff reported she fell and hit her left hip and elbow on a bedside table. (Tr. 712). The pain in her elbow resolved on its own, but the hip pain continued. *Id*. Plaintiff reported chronic back pain, and "mild difficulty" ambulating. *Id*. Further, Plaintiff reported a history of Lupus, *id.*; but as the ALJ pointed out, this diagnosis does not appear anywhere in her medical history (Tr. 16). On examination, Plaintiff had pain and swelling on her left hip, but an x-ray revealed no fractures or dislocation. (Tr. 713). Plaintiff stated she would be able to ambulate effectively with pain medication. *Id*. The ALJ also

recognized Plaintiff reported pain, swelling, and joint stiffness many times during past appointments, but her gait remained normal. Tr. 16 (citing Tr. 725) (May 2010 emergency room visit where Plaintiff effectively ambulated, maintained her position, and did not list); (Tr. 727) (May 2010 examination where Plaintiff had a normal MRI and was "able to ambulate without difficulty"); (Tr. 1061) (May 2012 hospitalization where Plaintiff had a normal gait on examination). The ALJ also pointed to a specific examination, where Plaintiff's leg edema improved on Lasix. *Id.* (citing Tr. 1292).

Because Plaintiff has not presented sufficient medical evidence to establish a "gross anatomical deformity" of a major joint supported by medically acceptable imaging studies as required under the Listing, the undersigned finds she has not carried her burden to prove that all the elements of the Listing are satisfied. 20 C.F.R. Pt. 404, Subpt. P., App'x 1, Listing 1.02; *King,* 742 F.2d at 974. Thus, the undersigned finds no error in the ALJ's determination that Plaintiff did not meet or equal Listing 1.02. Her decision is supported by substantial evidence.

### Listing 11.14 [4]

Plaintiff next argues the ALJ erred in finding she did not meet the requirements of Listing 11.14. (Doc. 15, at 17). In support, Plaintiff again points to her use of a walker. *Id.* The ALJ did not specifically address Listing 11.14, but the Commissioner responds that this is not a reversible

---

4. In her brief, Plaintiff cites the requirements of a newer version of Listing 11.14. (Doc. 15, at 17). However, that version of Listing 11.14 was not effective until September 29, 2016. The version of Listing 11.14 applicable in this case was effective May 24, 2016 to September 28, 2016, and is available on Westlaw.

error. (Doc. 17, at 17-18). For the reasons discussed below, the undersigned affirms the decision of the Commissioner in this regard.

The Sixth Circuit has found an ALJ's conclusory findings at Step Three to be harmless error where the claimant did not put forth sufficient evidence to demonstrate that her impairments met or medically equaled the severity of the listing. *See Smith–Johnson v. Comm'r of Soc. Sec.,* 579 F. App'x 426, 432 (6th Cir. 2014); *see also Forrest v. Comm'r of Soc. Sec.,* 591 F. App'x 359, 365 (6th Cir. 2014) (citing *Reynolds v. Comm'r of Soc. Sec.,* 424 F. App'x 411, 416 (6th Cir. 2011)) (finding that an ALJ erred by providing no reasons to support his finding that a specific listing was not met, and holding that the error was not harmless because it was possible that the claimant had put forward sufficient evidence to meet the listing)); *Sheeks v. Comm'r of Soc. Sec.,* 544 F. App'x 639, 642 (6th Cir. 2013) ("A substantial question about whether a claimant meets a listing requires more than what Sheeks has put forth here, a mere toehold in the record on an essential element of the listing."). Thus, in instances where the ALJ does not evaluate a listing, the court must "determine whether the record evidence raises a substantial question as to Smith-Johnson's ability to satisfy each requirement of the listing." *Smith–Johnson,* 579 F. App'x. at 432-33. The claimant "must point to specific evidence that demonstrates he [or she] reasonably could meet or equal every requirement of the listing." *Id.* at 432. "Absent such evidence, the ALJ does not commit reversible error by failing to evaluate a listing at Step Three." *Id.* at 433.

Here, the ALJ's decision does not discuss Listing 11.14, therefore the Court must determine whether the record evidence raises a substantial question as to Plaintiff's ability to satisfy each requirement of the listing. To meet the criteria of Listing 11.14, peripheral neuropathy, Plaintiff must establish:

A. Disorganization of motor function in two extremities (see 11.00D1), resulting in an extreme limitation (see 11.00D2) in the ability to stand up from a seated position, balance while standing or walking, or use the upper extremities; or

B. Marked limitation (see 11.00G2) in physical functioning (see 11.00G3a), and in one of the following:

    1. Understanding, remembering, or applying information (see 11.00G3b(i)); or
    2. Interacting with others (see 11.00G3b(ii)); or
    3. Concentrating, persisting, or maintaining pace (see 11.00G3b(iii)); or
    4. Adapting or managing oneself (see 11.00G3b(iv)).

20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 11.14. As to the definition of "disorganization of motor function", referenced in 11.14(A), § 11.00(D)(1) provides:

D. What do we mean by disorganization of motor function?

1. Disorganization of motor function means interference, due to your neurological disorder, with movement of two extremities; i.e., the lower extremities, or upper extremities (including fingers, wrists, hands, arms, and shoulders). By two extremities we mean both lower extremities, or both upper extremities, or one upper extremity and one lower extremity. All listings in this body system, except for 11.02 (Epilepsy), 11.10 (Amyotrophic lateral sclerosis), and 11.20 (Coma and persistent vegetative state), include criteria for disorganization of motor function that results in an extreme limitation in your ability to:

a. Stand up from a seated position; or
b. Balance while standing or walking; or
c. Use the upper extremities (including fingers, wrists, hands, arms, and shoulders).

20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 11.00(D)(1).

In her brief to the Court, Plaintiff does not point to any specific evidence that she meets Listing 11.14, other than her use of a walker. (Doc. 15, at 18). In support, Plaintiff points to the ALJ's determination in the RFC that she would, at times, require a walker to ambulate. *Id.* (citing Tr. 18, 23). As noted above, in order to meet Listing 11.14, Plaintiff needs to show *much more* than the need to occasionally use a walker. Plaintiff must show "disorganization of motor function . . . . *due to [a] neurological disorder*" which places an "extreme limitation" on her ability to "stand up from a seated position, balance while standing or walking, or use the upper extremities".

20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 11.14; § 11.00(D)(1) (emphasis added). While the RFC recognizes Plaintiff has some difficulty standing or walking for long periods of time, Plaintiff does not point to any evidence that this limitation is an *extreme* one, as required by the Listing, nor does she raise a "substantial question" as to whether she satisfies any of the other requirements of the Listing. Thus, the undersigned concludes that any error with the ALJ's failure to analyze Listing 11.14 is harmless. *See Smith-Johnson*, 579 F. App'x at 432 ("A claimant must do more than point to evidence on which the ALJ could have based his finding to raise a 'substantial question' as to whether he has satisfied a listing. Rather, the claimant must point to specific evidence that demonstrates he reasonably could meet or equal every requirement of the listing.").

*Necessity of a Walker*

The parties dispute whether the ALJ correctly determined Plaintiff could ambulate effectively, and therefore did not medically equal the requirements of Listing 1.02 or 11.14. (Doc. 15, at 15). In support, Plaintiff relies heavily on her use of a walker as proof she cannot ambulate effectively. *Id*. at 13. She argues the ALJ failed to find the walker was necessary, and thus erred when she found Plaintiff did not medically equal either Listing. *Id*. Plaintiff relies on the regulatory definition of "medically required" found in Social Security Ruling 96-9p. *Id.* at 14. That ruling explains: "[t]o find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information)". SSR 96-9p, 1996 WL 374185, at *7.

Here, in conjunction with the Listing analysis, the ALJ thoroughly considered Plaintiff's use of a walker, and ultimately found "the record does not establish that any such device is

medically required", and Plaintiff's use of the walker "is no more than intermittent during the period in question". (Tr. 18). This determination is supported by substantial evidence. First, the ALJ noted Plaintiff reported to the Social Security Agency that Dr. Garcia prescribed a walker in October 2012, *see id.* (citing Tr. 531), but his records do not contain a prescription for an ambulatory aid. *Id.* The ALJ also pointed to a May 2010 emergency room visit where Plaintiff reported she used a walker due to left hip pain following the above-mentioned October 2009 bedside fall. *Id.* (citing Tr. 725-27). However, Plaintiff had an "entirely normal" MRI, and was "able to ambulate without difficulty". *Id.* (citing Tr. 727). Further, the ALJ recognized that at an October 2010 psychiatric examination, Plaintiff reported she used a walker, but did not have it with her because it would not fit in her car. *Id.* (citing Tr. 812). At a May 2012 emergency room visit, Plaintiff had a normal gait, and normal strength with intact sensation and normal reflexes. *Id.* (citing Tr. 1062). In November 2012, Dr. Davis noted Plaintiff used a walker, but walked from the waiting room to his office without it. (Tr. 1365). Finally, the ALJ noted that, as recently as March 2015, Plaintiff had a normal gait and reflexes with grossly intact sensation on examination. (Tr. 18) (citing Tr. 1851).

In her Listing analysis, the ALJ recognized Plaintiff has physical challenges with joint pain and swelling in her lower extremities, however, substantial evidence supports the ALJ's determination that the walker was not medically necessary, and her use of a walker was "no more than intermittent". (Tr. 18). The RFC reflects this finding. A claimant's RFC is an assessment of "the most [she] can still do despite [her] limitations." 20 C.F.R. § 404.1545(a)(1). An ALJ must consider all symptoms and the extent to which those symptoms are consistent with the objective medical evidence. § 404.1529. As discussed above, the ALJ thoroughly examined the record and determined Plaintiff could perform sedentary work, as defined by the regulations, with the ability

to occasionally use a walker for ambulation. (Tr. 23). Because the ALJ's decision regarding medical necessity of a walker is supported by substantial evidence, Plaintiff's argument that her condition is equivalent to either Listing, because she requires a walker, is also without merit. The undersigned finds no error in this determination.

Mental Impairment

Finally, Plaintiff argues the ALJ failed to properly evaluate the severity of her psychiatric impairments. (Doc. 15, at 19). The Commissioner responds that the ALJ adequately considered Plaintiff's psychiatric impairments as evidenced by the significant mental limitations she included in the RFC. (Doc. 17, at 19). For the reasons discussed below, the undersigned affirms the decision of the Commissioner in this regard.

First, Plaintiff argues the ALJ failed to provide "substantial evidence or good reasons", to support her conclusion that Plaintiff does not meet the requirements of Listing 12.04 and 12.06. (Doc. 15, at 19). As mentioned above, the claimant has the burden to prove all elements of a listing is satisfied. *King,* 742 F.2d at 974. Moreover, "[t]he burden of providing a . . . record . . . complete and detailed enough to enable the Secretary to make a disability determination rests with the claimant." *Landsaw,* 803 F.2d at 214. It is not sufficient to come close to meeting the conditions of a Listing. *See, e.g., Dorton,* 789 F.2d at 367 (Commissioner's decision affirmed where medical evidence "almost establishes a disability" under Listing).

In evaluating the severity of Plaintiff's mental impairments, the ALJ first determined:

> The severity of the claimant's mental impairments, considered singly and in combination, did not meet or medically equal the criteria of listings 12.02, 12.04, 12.05, 12.06, and 12.09. In making this finding, the undersigned has considered whether the "paragraph B" criteria ("paragraph D" criteria of listing 12.05) were satisfied. To satisfy the "paragraph B" criteria ("paragraph D" criteria of listing 12.05), the mental impairments must result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace;

or repeated episodes of decompensation, each of extended duration. A marked limitation means more than moderate but less than extreme. Repeated episodes of decompensation, each of extended duration, means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks.

(Tr. 21).

Listing 12.04 (affective disorders) requires "depressive syndrome" characterized by at least four of the following:

a. Anhedonia or pervasive loss of interest in almost all activities; or
b. Appetite disturbance with change in weight; or
c. Sleep disturbance; or
d. Psychomotor agitation or retardation; or
e. Decreased energy; or
f. Feelings of guilt or worthlessness; or
g. Difficulty concentrating or thinking; or
h. Thoughts of suicide; or
i. Hallucinations, delusions, or paranoid thinking.

20 C.F.R. § Pt. 404, Subpt. P, App. 1, Listing 12.04.

The ALJ also considered Plaintiff's impairments under Listing 12.06 (anxiety related disorders). To meet the requirements of Listing 12.06, Plaintiff must show she has medically documented findings in at least one of the following:

1. Generalized persistent anxiety accompanied by three out of four of the following signs or symptoms:
  a. Motor tension; or
  b. Autonomic hyperactivity; or
  c. Apprehensive expectation; or
  d. Vigilance and scanning; or

2. A persistent irrational fear of a specific object, activity, or situation which results in a compelling desire to avoid the dreaded object, activity, or situation; or

3. Recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week; or

4. Recurrent obsessions or compulsions which are a source of marked distress; or

5. Recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress;

20 C.F.R. § Pt. 404, Subpt. P, App. 1, Listing 12.06. For Listings 12.04 and 12.06, the symptoms must result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of an extended duration. 20 C.F.R. § Pt. 404, Subpt. P, App. 1, Listing 12.04 and 12.06.

Here, substantial evidence supports the ALJ's conclusion that: (1) Plaintiff does not meet the criteria for Listing 12.04 or 12.06; and (2) further RFC restrictions are not necessary. First, as evidence she has more than moderate difficulties in social functioning, and in concentration, persistence, and pace, Plaintiff points to the opinion of her treating physician, Dr. Garcia. (Doc. 15, at 20). Plaintiff argues the ALJ failed to thoroughly consider the opinion of Dr. Garcia and the limitations he assessed. *Id*. The ALJ considered Dr. Garcia's opinion and determined his mental health assessment was not persuasive:

> Dr. Garcia treated the claimant for a mental impairment and he provided an opinion on October 9, 2012 that the claimant had a poor ability to function in every category assessed (Exhibit 13F). However, this level of limitation is not consistent with the claimant's continued ability to care for her daughter and to maintain relationships with the friends with whom she was living at the time. She reportedly spent much of her time watching TV, but she did not require psychiatric hospitalization during the period in question and appeared to be sufficiently stable with medication. Accordingly, the opinion of Dr. Garcia is not given controlling weight as it appears to somewhat exaggerate the severity of the claimant's condition. Furthermore, Dr. Garcia did not provide any basis for these assessments (Exhibit 13F). As this lowest of ratings is not consistent with the other evidence of record, it cannot be considered persuasive in the determination of disability.

(Tr. 22).

Plaintiff argues that, because Dr. Garcia reported Plaintiff's mental capacity was poor in all areas, she was more than moderately limited in her social functioning, concentration,

persistence, and pace. (Doc. 15, at 19-20). This argument is without merit, as the ALJ's determination that Dr. Garcia's opinion was not entitled to controlling weight is supported by substantial evidence. As a treating physician, Dr. Garcia's opinion is only given "controlling weight" if it is supported by: 1) medically acceptable clinical and laboratory diagnostic techniques; and 2) is not inconsistent with other substantial evidence in the case record. *Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 544 (6th Cir. 2004). Importantly, the ALJ must give "good reasons" for the weight he gives a treating physician's opinion, reasons that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Ealy v. Comm'r of Soc. Sec.,* 594 F.3d 504, 514 (6th Cir. 2010). When determining weight and articulating "good reasons", the ALJ "must apply certain factors" to the opinion. *Rabbers v. Comm'r Soc. Sec. Admin.,* 582 F.3d 647, 660 (6th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)). These factors include the length of treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating source. *Id.*

Here, the ALJ pointed out that Dr. Garcia checked "poor" in every single category of mental functioning (Tr. 1359-60), and the portion of the form which asked for medical or clinical support for the findings was left blank (Tr. 1360). The ALJ also found that such an extreme limitation was not consistent with other evidence of record. (Tr. 22). This is supported by the record. For example, the ALJ noted that at her intake assessment with NCMH, Plaintiff reported she was unable to function in most social situations because of panic attacks, yet enjoyed walking in the park, going to the mall, and taking her daughter to the zoo. (Tr. 23) (citing Tr. 700). The examiner also found she completed independent activities of daily living. (Tr. 701). During a

January 2010 appointment at NCMH, Plaintiff had a clean appearance, normal speech, average eye contact and demeanor, had no delusions, and no anxiety. (Tr. 838). The following month, these mental status findings were unchanged and Plaintiff said she was "having a good day". (Tr. 833). Here, the ALJ gave several examples why Dr. Garcia's opinion was not consistent with the record as a whole. And, as noted above, consistency and supportability are two factors an ALJ must apply when weighing the opinion of a treating physician. *Rabbers,* 582 F.3d at 660 (citing 20 C.F.R. § 404.1527(d)(2)). Therefore, the ALJ's decision to discount the opinion of Dr. Garcia is supported by substantial evidence in the record.

Further, Plaintiff argues the ALJ failed to consider the agoraphobia diagnosis of consultative examiner, Dr. Davis. (Doc. 15, at 19). As an initial matter, an examining, but not treating, source is one who has examined Plaintiff, but did not have an ongoing treatment relationship. 20 C.F.R. §§ 404.1527 and 404.1502; SSR 96-2, 1996 WL 374188 at *1. Dr. Davis examined Plaintiff one time – on November 5, 2012. (Tr. 1364).

The ALJ found Dr. Davis's opinion persuasive:

> Dr. Davis, a psychologist, evaluated the claimant in November, 2012, and diagnosed adjustment disorder with depressed mood; borderline intellectual functioning; and panic disorder with agoraphobia (Exhibit 14F). The claimant alleged she had 2 or 3 anxiety attacks a day. Richard Davis diagnosed borderline intellectual functioning but noted she was able to respond to questioning at the examination and that she had completed the 11th or 12th grade and had a work history of semi-skilled work. He provided an opinion that the claimant has the ability to understand, remember and carry out at least simple instructions and can perform simple repetitive tasks. The Administrative Law Judge finds this opinion persuasive as it is consistent with the evidence of record.

(Tr. 24).

Here, the ALJ found Dr. Davis's opinion persuasive because it was consistent with the evidence of record. *Id.* Though Dr. Davis diagnosed Plaintiff with agoraphobia, at the same time he opined she could understand, remember, and carry out at least simple instructions; and perform

simple repetitive tasks. (Tr. 1368). He recognized Plaintiff was able to stay employed for a lengthy period of time, and saw herself as unemployable "primarily because of her physical problems". *Id*. The ALJ ultimately incorporated these findings into the RFC. (Tr. 23). To account for limitations in concentration, persistence, and pace, the ALJ limited Plaintiff to understanding and remembering instructions for simple, repetitive tasks in a relaxed setting without production quotas. *Id*. And, the ALJ accounted for Plaintiff's social interaction limitations by limiting her to superficial interaction with others – including the public. (Tr. 23). The ALJ's consideration of Dr. Davis's opinion further supports the conclusion that Plaintiff does not meet the criteria for Listing 12.04 or 12.06.

The ALJ further summarized Plaintiff's limitations and offered additional support to the conclusion Plaintiff did not meet the criteria for either Listing. In support of her findings that Plaintiff had no more than moderate difficulties in social functioning, the ALJ recognized that Plaintiff lived with her friends, even though she alleged it was difficult for her to make friends. (Tr. 21) (citing Tr. 1369). With concentration, persistence, and pace, the ALJ also found Plaintiff had moderate limitations. *Id*. In support, she cited Plaintiff's ability to care for her child, and maintain concentration while watching television or reading a book. *Id*. Finally, the ALJ found the record showed no episodes of decompensation that were of an extended duration. *Id.*

Ultimately, the ALJ limiting Plaintiff to sedentary work with additional restrictions, as well as simple, repetitive work with limited social interaction, is significant. (Tr. 22-23). By placing these restrictions, the ALJ recognizes Plaintiff *is* limited, but less substantially than she asserts. The mere existence of impairments prior to the date last insured does not establish they were significantly limiting at that time. *Seeley v. Comm'r of Soc. Sec.*, 600 F. App'x 387, 390 (6th Cir. 2015). Although Plaintiff can point to evidence suggesting a contrary conclusion, this Court must

affirm even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones,* 336 F.3d at 477.

## CONCLUSION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying DIB supported by substantial evidence and affirms that decision.


 s/ James R. Knepp II
United States Magistrate Judge